UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NORMAN E. WEBB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-cv-00246-JCN |
| | ) | |
| TOWN OF ORONO, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM[1] OF DECISION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Norman Webb alleges that Defendant Town of Orono unlawfully terminated his employment.  More specifically, Plaintiff maintains that Defendant terminated his employment because of his age and physical disability, and because he filed an administrative discrimination claim.

The matter is before the Court on Defendant's Motion for Summary Judgment.  (Motion, ECF No. 33.)  Through its motion, Defendant contends that the record does not support any of Plaintiff's claims.  Following a review of the record, and after consideration of the parties' arguments, the Court grants in part and denies in part the motion.

**BACKGROUND**

Plaintiff Norman Webb worked for the Defendant from August 1983 to June 14, 2012.  (Pl.'s Statement of Additional Material Facts (PSAMF) ¶ 49.)[2]  On his last day of work for Defendant, Plaintiff was 61 years of age.  (*Id.* ¶ 50.)  At the end of his employment, Plaintiff was

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge John C. Nivison conduct all proceedings in this case, including trial, and to order entry of judgment.

[2] Citation to Plaintiff's Statement of Additional Material Facts is meant to include a citation to Defendant's Reply Statement of Material Facts (ECF No. 40).

serving as Chief of the Fire Department in accordance with a written contract that provided for a term of December 21, 2009, through December 31, 2012.  (*Id.* ¶ 5.)

Defendant's Town Manager, Sophia Wilson, began working in that capacity on April 1, 2011.  (Def.'s Statement of Material Facts (DSMF) ¶ 1.)[3]  Because Ms. Wilson believed that the Defendant's Town Council hired her to be a "hands-on" manager, she was involved in the day-to-day operations of the Town, worked closely with the department heads, held the department heads accountable for the responsibilities of their positions, and tried to stay informed about developments in all of the departments.  (*Id.* ¶ 2.)

In April 2011, after some emergency medical service records were determined to be missing, Plaintiff was notified that "notice of counseling" by which notice Ms. Wilson informed Plaintiff that he must review the Fire Department's HIPPA policies and procedures.  (*Id.* ¶ 12.)[4] Ms. Wilson subsequently authorized Plaintiff to place a lock on the administrative wing of the Fire Station, provided that he always informed her and the police chief of the current code to ensure that they could access the Fire Station.  (*Id.*)

In or around January 2012, with the term of Plaintiff's employment agreement set to expire in approximately 11 months, Ms. Wilson met with Plaintiff, and asked him how much longer he planned to work as Fire Chief.  Plaintiff advised that he wanted to work until he was 66 years old. (*Id.* ¶ 6.)  Ms. Wilson maintains that she did not know Plaintiff's age at that time, and asked Plaintiff about his plans for the purpose of succession planning.  (*Id.* ¶ 7.)  She did not mention

---

[3] Citation to Defendant's Statement of Material Facts is meant to include a citation to Plaintiff's Responsive Statement of Material Facts (ECF No. 35-2).

[4] Defendant has a graduated or progressive disciplinary policy consisting of (1) an oral warning; (2) a written warning; (3) suspension; and (4) termination.  (*Id.* ¶ 78.)

succession planning in her meeting with Plaintiff.[5]  (*Id.*)  During the meeting, when it was obvious

that Plaintiff was having difficulty walking, Ms. Wilson asked Plaintiff about his difficulty, and

he informed her that he needed to have his knees replaced.  (*Id.* ¶ 8.)  Plaintiff's condition did not

render him unable to perform his job and he could satisfy the physical requirements of the annual

physical.  (PSAMF ¶¶ 54 – 55.)  In April 2012, when they were walking together, Ms. Wilson said

to Plaintiff, "You're walking kind of rough, your knees must be in bad shape."  (*Id.* ¶ 56.)

On May 26, 2012, Police Sergeant Wilcox reported that one of the Fire Department's

employees acted inappropriately while responding to an automobile accident on the Main Street

bridge (the bridge incident).  (DSMF ¶ 9.)  Ms. Wilson met with Plaintiff and Police Chief Gary

Duquette to discuss the bridge incident, and she instructed Plaintiff to conduct an investigation.

(*Id.* ¶ 10; PSAMF ¶ 58.)  Plaintiff learned of the bridge incident five minutes prior to the meeting.

(PSAMF ¶ 60.)  At the bridge incident, six police officers and two firefighters were present.

Following the meeting, Plaintiff received reports from the other firefighter EMT who was on the

scene, and from the employee under investigation; Plaintiff provided copies of the reports to Ms.

Wilson and Chief Duquette.  (*Id.* ¶ 61.)

On or about June 4, 2012, after an evening meeting with the Town Council, Ms. Wilson

attempted to enter the Fire Station, but could not access the station because her code for the key

panel lock was no longer valid.  (*Id.* ¶ 11.)  On June 5, Plaintiff and Ms. Wilson met for their

regular weekly meeting, and Ms. Wilson asked Plaintiff the reason for her inability to access with

the code the administrative wing of the Fire Station.  (*Id.* ¶ 14.)  Plaintiff advised that he changed

the code on June 1, without informing Ms. Wilson or Chief Duquette, because he did not believe

---

[5] Plaintiff states that Ms. Wilson never discussed with him who might be a good choice to replace him as fire chief. (PSAMF ¶¶ 67 – 68.)

that probation and parole should be able to access and use the conference room in the Fire Department's administrative wing.  (*Id.* ¶ 15.)

At the same meeting, Ms. Wilson asked Plaintiff about his investigation into the bridge incident.   Plaintiff reported that he had not found any wrongdoing on behalf of the Fire Department's employees, that he believed the Police Department personnel should have intervened if there was an issue, and that he had not prepared a written report regarding the investigation.[6] (DSMF ¶ 16.)  At the time, Plaintiff had obtained statements from the two EMTs at the scene, and had asked the medical director and the fire chief of Old Town to review the EMS run sheets; they had reported nothing amiss.[7]  (*Id.* ¶ 17.)

On June 6, Plaintiff met with Ms. Wilson and a human resources consultant.  Ms. Wilson explained her concerns about Plaintiff's work performance, including her concerns about conduct that she believed amounted to insubordination.  (*Id.* ¶ 18.)[8]  Ms. Wilson never provided Plaintiff with any written disciplinary action other than with respect to the HIPPA matter.  (PSAMF ¶ 69.) Ms. Wilson also did not raise any issues regarding the operation of the Fire Department.  (*Id.* ¶ 72.)

Ms. Wilson specifically discussed Plaintiff's refusal to work cooperatively with Police Chief Duquette, and his derogatory comments about the police department to Sergeant Wilcox as

---

[6] Ms. Wilson had not requested a written report.

[7] Plaintiff asserts that his investigation was "still ongoing" (Webb Affidavit ¶ 8) and that he was "actively investigating the circumstances" (PSAMF ¶ 63) when his employment was terminated.  However, at his deposition, Plaintiff testified that he reported to Ms. Wilson that he found no wrongdoing.  (Webb Deposition at 53:14–18.)

[8] In his affidavit, Plaintiff asserted that Ms. Wilson's complaints about his performance were limited to his decision to change the access code without notifying her and the fact that he did not get along well with the police chief.  (Webb Affidavit ¶ 6.)

part of his investigation of the bridge incident.  (DSMF ¶ 19.)[9]  Chief Duquette is several years

younger than Plaintiff. (PSAMF ¶ 109.) Because the day before Plaintiff spoke with Sergeant

Wilcox, Ms. Wilson met with Plaintiff and Chief Duquette to emphasize that it was important for

them to work together in connection with the bridge incident, Ms. Wilson interpreted Plaintiff's

derogatory remarks as defiant of her directive to work collaboratively.[10]  (DSMF ¶ 20.)  Plaintiff

and Ms. Wilson also discussed Plaintiff's unilateral decision to change the lock on the Fire Station,

including her belief that his actions constituted insubordination.   During the discussion, Ms.

Wilson learned that Plaintiff still had not given the new code to the police chief.  (*Id.* ¶ 21.)

At the conclusion of the June 6 meeting, Ms. Wilson directed Plaintiff to develop a concrete

plan to restore her confidence in his ability to lead the Fire Department.[11]  (*Id.* ¶ 23.)  Plaintiff

committed to work on his relationship with the police chief, talk with Ms. Wilson more often, and

provide Ms. Wilson with more details about the Fire Department's operations and any issues that

he might have to address within the Fire Department.  (*Id.* ¶ 24.)  Ms. Wilson and the consultant

informed Plaintiff that he needed to provide specific, quantifiable steps that could be evaluated,

and that broad statements about ill-defined goals were not acceptable.  (*Id.* ¶ 25.)  At the conclusion

of the meeting, Plaintiff understood that Ms. Wilson had given him a list of matters that he needed

to work on, that his job was in jeopardy, and that she wanted to meet the next day, June 7, to

discuss his concrete plan.  (*Id.* ¶ 26.)  Ms. Wilson asked Plaintiff to provide specific ways that he

---

[9] Plaintiff's deposition testimony reflects that Sergeant Wilcox informed Ms. Wilson that when Plaintiff spoke with Sergeant Wilcox about the bridge incident, Plaintiff discussed the actions or inactions of police personnel at the scene. (Webb Dep. at 39, PageID # 115.)

[10] Plaintiff asserts that he tried to work with the police chief, but that Chief Duquette resisted his efforts and would cancel training sessions he had set up.  (PSAMF ¶ 65.)

[11] Ms. Wilson did not provide Plaintiff with any written directives.  Plaintiff also states that to his recollection he did not fail to follow any of Ms. Wilson's oral directives.  (PSAMF ¶ 66.)

planned to change.  (*Id.* ¶ 29.)  Plaintiff maintains that he "had no idea what Ms. Wilson was looking for" and "had no idea what was wrong" other than the access code and his discord with the police chief.  (PSAMF ¶ 73.)

On June 7, Ms. Wilson met with Plaintiff to afford him an opportunity to present his specific plan to restore her confidence in his ability to lead the Fire Department.  (DSMF ¶ 27.)  Plaintiff appeared at the meeting with some notes, but he did not present a written plan.[12]  When Ms. Wilson asked him for the specific measures that he planned to implement, Plaintiff said that he was going to work on his relationship with the police chief and talk with Ms. Wilson more often. (*Id.* ¶ 28.)  Ms. Wilson told Plaintiff that she would think about the situation over the upcoming weekend, and that they would meet again the following week.  (*Id.* ¶ 31.)

On June 12, Plaintiff and Ms. Wilson met for their regular weekly meeting.  (*Id.* ¶ 32.)  According to Ms. Wilson, they discussed the status of Plaintiff's investigation into the bridge incident.  (*Id.*)[13]  Ms. Wilson informed Plaintiff that his report that the Fire Department did not engage in any wrongdoing and that the matter was closed did not constitute a sufficient investigative report.  (*Id.* ¶ 33.)  At the end of the meeting, Ms. Wilson told Plaintiff that the human resources consultant was out of town, but that the three of them would meet again on June 14.  (*Id.* ¶ 36.)

When Plaintiff asked about the possible outcome of the meeting, Ms. Wilson said that Plaintiff could potentially remain employed under an agreement providing him with a final

---

[12] Plaintiff states that Ms. Wilson did not ask for a written plan. (Plaintiff's Responsive Statement of Material Facts ¶ 27).  The transcript of Plaintiff's deposition reflects that Plaintiff testified that he had a plan, but Ms. Wilson did not ask him for it.  (Webb Dep. at 71:13–17.)  When asked whether he had left the meeting the day before knowing they would meet the next day to discuss his concrete written plan, Plaintiff responded, "I guess so. I don't really know. I don't really understand your question."  (*Id.* at 72:12–23.)

[13] Plaintiff offers a qualification that he "does not recall" discussing the bridge incident.  (Plaintiff's Responsive Statement of Material Facts ¶ 32.)

opportunity to address the issues of concern, or Plaintiff could be separated from his employment. (*Id.* ¶ 37.)  As Plaintiff left the meeting on June 12, he knew that his employment might end at the June 14 meeting.  (*Id.* ¶ 38.)

On June 13, Ms. Wilson consulted with the Town's attorney, and she had a draft separation agreement prepared for use at the meeting with Plaintiff the following day.  (*Id.* ¶ 39.)  Plaintiff, through counsel, filed a complaint alleging discrimination with the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC) on June 13. (*Id.* ¶ 40.)  Ms. Wilson received a copy of Plaintiff's MHRC/EEOC complaint on June 14, shortly before the meeting that she had scheduled with Plaintiff and the human resources consultant.  (*Id.* ¶ 41.)

At the June 14 meeting, Ms. Wilson was not satisfied with the information provided by Plaintiff because in her view, he did not present her with a specific plan to restore her confidence in his ability to lead the Fire Department.  (*Id.* ¶ 44.)  Ms. Wilson provided Plaintiff with a copy of his employment agreement and asked him to review Section 2.C., a provision that authorizes the termination of employment without cause with the payment of four months' salary.  (*Id.* ¶ 45.) Ms. Wilson told Plaintiff that while she believed there were adequate grounds to terminate his employment for cause, given his years of service to the Town, she wanted to terminate his employment agreement without cause pursuant to Section 2.C.  (*Id.* ¶ 46.)  Ms. Wilson also gave Plaintiff a draft separation agreement, which proposed that Plaintiff receive six months of severance pay in exchange for a voluntary resignation; Plaintiff rejected the proposal.  (*Id.* ¶ 47.) Ms. Wilson then terminated Plaintiff's employment with Defendant, citing the "without cause" provision of his employment agreement.  (*Id.* ¶ 48.)

The prior town manager had given Plaintiff positive evaluations, and Plaintiff had never received a negative evaluation as fire chief in 5 – 6 years.  (Plaintiff's Statement of Additional Material Facts ¶ 80.)  Plaintiff's attendance was outstanding and under his leadership, the Fire Department was typically under budget.  (*Id.* ¶ 94.)

Beginning in January 2012, seven of Defendant's department heads had either resigned from their employment or had their employment terminated.  (PSAMF ¶ 76.)[14]  The age of the work force is a factor in the way health insurance rates for Defendant are determined.  (*Id.* ¶ 88.)  Defendant's experience rating became a factor in health insurance rates as of January 2012 when it reached 60 employees.  (*Id.* ¶ 89.)  Annie Brown, Defendant's treasurer/tax collector and a 37-year employee, and Ms. Wilson discussed the Town's health insurance rates and reviewed the quarterly printout of claims from MMA, but never discussed taking any measures to reduce the rates.  (*Id.* ¶ 90.)

Ms. Wilson hired a finance director, Matt Currier, who was then approximately 26 years old.  Ms. Wilson also designated Mr. Currier as Ms. Brown's supervisor.  (*Id.* ¶ 95.)  Previously, Ms. Brown had never had a supervisor other than the assistant Town Manager.  Robert St. Louis, who was in his mid-40s, replaced Plaintiff as fire chief.  (*Id.* ¶ 100.)

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"

---

[14] Ms. Wilson became town manager in April 2011.  Some of the other employees suggest that age was a factor in their separation from employment.  (Plaintiff's Statement of Additional Material Facts ¶¶ 91, 111.)

*Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998)).

The Court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the Court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists, and summary judgment must be denied to the extent a claim is supported by the record. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

### DISCUSSION

Plaintiff asserts three claims, based on violations of the Maine Human Rights Act and the Age Discrimination in Employment Act: age discrimination (Count I), disability discrimination (Count II), and retaliation (Count III).[15] Defendant argues that the record evidence does not and cannot support Plaintiff's claims.

**A.     Age Discrimination**

To prove wrongful termination based on age, Plaintiff must show that age was the "determinative factor" in Defendant's termination decision; that but for his age, he would not have been fired. *Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.*, ___ F.3d ___, No. 14-2057, 2015 WL 6143389, at *2 (1st Cir. Oct. 20, 2015) (citing *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988)). Absent direct evidence of discriminatory bias, and the record

---

[15] As this Court has previously observed, Maine and federal discrimination claims are ordinarily evaluated using the same standards. *E.g.*, *Donahue v. Clair Car Connection, Inc.*, 736 F. Supp. 2d 294, 315 (D. Me. 2010) (addressing claims under the MHRA and the ADEA) (citing *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 63 n.4 (D. Me. 2010)). Neither party suggests that the circumstances of this case warrant a departure from the ordinary approach.

in this case lacks any such evidence, the Court applies the familiar burden-shifting framework to evaluate circumstantial evidence of discrimination in the summary judgment context. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 – 805 (1973)).

The burden-shifting analysis begins with an assessment as to whether Plaintiff has presented a prima facie case of discrimination.  A prima facie case of age discrimination consists of evidence that Plaintiff (1) was at least 40 years of age; (2) met the employer's legitimate performance expectations; (3) was terminated and (4) was replaced by a younger person or was terminated under circumstances suggesting that age was not a neutral factor. *Id.*  If the Plaintiff satisfies the prima facie requirements, a rebuttable presumption of discrimination arises and the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its termination decision. *Id.*  In the event that Defendant demonstrates through record evidence a legitimate, nondiscriminatory basis for the employment decision, the burden returns to Plaintiff to show that Defendant's explanation is a pretext, and that age was a determinative factor. *Id.*

Defendant argues that Plaintiff has not established a prima facie case because Plaintiff has not proved that he performed his job satisfactorily.  The prima facie analysis, however, does not require an assessment of the relative merits of the parties' arguments.  Instead, the analysis contemplates a basic inquiry as to whether Plaintiff has satisfied the minimal elements of an age discrimination claim. *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004) (describing the prima facie standard as a "modest showing"); *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002) (describing the standard as a "low standard").

In support of his claim, Plaintiff has presented evidence (1) that he was more than 40 years old (i.e., 61), (2) that he satisfied Defendant's performance requirements (e.g., nearly 30 years of positive employment evaluations), (3) that Defendant terminated his employment, and (4) that he

10

was replaced by a younger person at or around a time when other employees of an advanced age left Defendant's employ, but not entirely voluntarily.  Plaintiff thus has presented a prima facie case of age discrimination.

Defendant, however, has articulated a legitimate, nondiscriminatory basis for the termination of Plaintiff's employment.  In particular, Plaintiff's alleged failure (a) to comply with certain reasonable requests of the Town Manager (e.g., advise the Town Manager if the access code to the Fire Department is changed), (b) to investigate thoroughly and objectively the bridge incident, and (c) to develop a specific plan for improvement, if proven, would constitute a legitimate, nondiscriminatory basis to end Plaintiff's employment.  Plaintiff, therefore, must present evidence that would support a finding that Defendant's stated reasons are a pretext for age discrimination.

Plaintiff can show pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the nondiscriminatory reasons offered by Defendant that are sufficient to permit a factfinder to conclude that Defendant's decision to terminate his employment was not for the stated reason and that the real reason was discriminatory bias.  *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 29 (1st Cir. 2015) (quoting *Gómez–González v. Rural Opportunities, Inc.,* 626 F.3d 654, 662 – 63 (1st Cir. 2010)); *see also Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015).  Plaintiff can also rely on comparator evidence suggesting his termination involved disparate treatment, i.e., that others similarly situated to him in all relevant respects were treated differently with respect to the relevant facts and circumstances advanced by Defendant in support of its termination decision.  *Ray*, 799 F.3d at 114.  "Deviation from established policy or practice" can also reinforce a pretext showing.  *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998); *see also Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696

F.3d 128, 143 (1st Cir. 2012).  When assessing pretext, the Court must consider "the total package of proof" presented by Plaintiff.  *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 174 (1st Cir. 2003).

In essence, Defendant maintains that it had cause to terminate Plaintiff's employment, but nevertheless chose to terminate his employment without cause based on his years of service.  While a fact finder could conclude that Defendant terminated Plaintiff's employment for lawful reasons, a fact finder could also reasonably conclude that Defendant's stated reasons are a pretext for age discrimination.  The record evidence reflects that after nearly 30 years of positive employment evaluations, within less than six months of Ms. Wilson's discussion with Plaintiff about his retirement plans, during which discussion Plaintiff expressed a desire to work an additional five years until he was 66, Ms. Wilson began a series of meetings to discuss performance issues that resulted in the termination of Plaintiff's employment and his replacement with a younger individual.

The general concern about a potential age bias among other employees, which concern is supported by the testimony of specific experiences of the employees, also supports Plaintiff's contention that Defendant's stated reasons are a pretext for age discrimination.  For instance, Paul Wintle, a 25-year employee who supervised the management and operation of the wastewater treatment plan, reported that at weekly staff meetings, employees "near or older than 60 were treated much less favorably than the younger senior staff," and that on one occasion, a member of the senior staff left the meeting "in tears due to the way she had been treated by [Ms.] Wilson." (*Id.* ¶¶ 111, 112.)

In addition, although Ms. Wilson maintains that Plaintiff was insubordinate, she never instituted formal disciplinary proceedings as prescribed by Defendant's policy.  Similarly, the

record lacks any evidence that the performance of the Fire Department personnel was deficient, or that the operations of the Department were substandard under Plaintiff's leadership.

Furthermore, while Ms. Wilson expressed great concern about Plaintiff's ability to work with the police chief, according to this record, other than in one meeting regarding the bridge incident, Ms. Wilson did not address with the police chief the need to improve the relationship. A fact finder could interpret her failure to address the issue at greater length with the police chief, who was several years younger than Plaintiff, to suggest that the relationship issue was not as significant as she maintains and was thus a pretext for age discrimination.

In short, Plaintiff has presented evidence that in the context of summary judgment is sufficient to support the conclusion that Defendant's stated reasons for the termination of Plaintiff's employment were a pretext for age discrimination. Whether Defendant terminated Plaintiff's employment for lawful reasons, or whether the termination constitutes unlawful age discrimination is an issue for the fact finder's consideration.

## B.    Disability Discrimination

Plaintiff's disability discrimination claim is subject to the same burden-shifting approach that applied to his age discrimination claim. To establish a prima facie case for disability discrimination, Plaintiff must demonstrate that he (1) was disabled within the meaning of the Americans with Disabilities Act or the MHRA; (2) was qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was discharged in whole or in part because of his disability. *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 87 (1st Cir. 2012).

Although Plaintiff has presented evidence to support his claim that he is disabled due to his knee condition, and that he was qualified to perform the essential functions of the job with or without a reasonable accommodation, the evidence to support his contention that he was

13

discharged in whole or part because of his disability is lacking. In fact, other than Ms. Wilson's brief observations about Plaintiff's obvious difficulty walking, the record lacks any evidence that Ms. Wilson considered Plaintiff's knee condition to be an impediment to Plaintiff's ability to perform his job, or that Plaintiff's knee condition influenced Ms. Wilson's decision to terminate Plaintiff's employment.

While the standard for showing prima facie discrimination is "low," *Zapata-Matos*, 277 F.3d at 44, the standard requires some evidence upon which a rational fact finder could conclude that Plaintiff's employment was terminated as the result of his disability. Ms. Wilson's two references to Plaintiff's condition simply do not satisfy the causation element necessary to establish a prima facie case. Indeed, given the lack of evidence of a causal link between Ms. Wilson's rather benign statements, to find on this record that Plaintiff has made a prima facie showing of disability discrimination, the Court would in essence have to ignore the causation element and conclude that it was sufficient for Plaintiff to prove that he was disabled and his employment was terminated. In short, without any other evidence that reasonably could be construed to suggest that Plaintiff's knee condition influenced Ms. Wilson's employment decision, Plaintiff has failed to establish a prima facie case that he "was discharged … in whole or part because of his disability." *Jones*, 696 F.3d at 87.

Even if the evidence could be construed to establish a prima facie case for disability discrimination, Ms. Wilson's two comments would not be sufficient to prove that Defendant's stated reasons for the termination of Plaintiff's employment constitute a pretext for disability discrimination. In the pretext analysis, "the ultimate burden" is on the Plaintiff to persuade the trier of fact that he was treated differently because of his disability. *Zapata-Matos*, 277 F.3d at 45 (quoting *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 2002)). "This burden is often

broken into two separate tasks.  The plaintiff must present sufficient evidence to show both that '[Defendant's] articulated reason for [terminating his employment] is a pretext' and that 'the true reason is discriminatory.'" *Thomas v. Eastman Kodak Co.*, 183 F.3d at 56 (quoting *Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir. 1995)).  While, as explained in the context of Plaintiff's age discrimination claim, Plaintiff has presented evidence to support his contention that the decision to terminate his employment might have been a pretext, he has presented no reliable evidence from which a fact finder could conclude that Plaintiff's disability influenced Ms. Wilson's decision making process. That is, Ms. Wilson's two references to Plaintiff's difficulty walking are insufficient to support a finding by a rational fact finder that Plaintiff's disability was a true reason for the termination of Plaintiff's employment.  *Id.*

Perhaps recognizing that more is necessary to satisfy his burden to prove a prima facie case or to prove the stated reasons for termination are a pretext for disability discrimination, Plaintiff cites Ms. Wilson's treatment of Paul Wintle upon his return from shoulder surgery.  According to Mr. Wintle, when he questioned Ms. Wilson's micromanagement of him upon his return to work, Ms. Wilson replied, "you haven't been here. You've been out with your shoulder injury." (*Id*. ¶ 115.)  Plaintiff contends that Ms. Wilson's comment reflects a discriminatory animus. (Pl. Opp. at 13-14.)

Plaintiff's argument fails.  First, to the extent that Plaintiff contends that Ms. Wilson's treatment of Mr. Wintle reflects a discriminatory animus toward employees with a disability, the record does not establish that Mr. Wintle in fact suffered from a disability.  In addition, while Ms. Wilson's statement could be construed to reflect a concern that Mr. Wintle had missed time from work, Plaintiff has presented no evidence that he has missed or expected to miss time from work as the result of his knee condition.  More importantly, Plaintiff has offered no evidence that Ms.

15

Wilson was concerned about the possibility that Plaintiff would be absent from work due to his knee condition. Accordingly, Plaintiff's reliance on Ms. Wilson's treatment of Mr. Wintle in connection with Mr. Wintle's return to work as evidence of Ms. Wilson's general discriminatory animus toward employees with a disability is unavailing.

Plaintiff, therefore, must rely on Ms. Wilson's two statements regarding Plaintiff's difficulty walking to support his pretext argument. Simply stated, just as the statements are insufficient to support a prima facie case of disability discrimination, the statements do not support Plaintiff's claim that Defendant's stated reasons for the termination of Plaintiff's employment are a pretext for disability discrimination.

## C.    Retaliation

Plaintiff's retaliation claim is also subject to the burden-shifting framework. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991). The prima facie showing requires evidence (1) that Plaintiff engaged in conduct protected under the ADEA or the MHRA,[16] (2) that he was thereafter subjected to an adverse employment action, and (3) that a causal connection existed between the protected conduct and the adverse action. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991). Liability for retaliation may be established even if the record would not support a claim of discrimination. *Id.*

Plaintiff has presented evidence (1) that he engaged in a protected activity (i.e., filing of a discrimination complaint), (2) that he was subsequently terminated from his employment, and (3) that his employment was terminated the day after he filed his discrimination complaint. A close

---

[16] The ADEA provides in pertinent part: "It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge … under this chapter." 29 U.S.C. § 623(d). The MHRA has a similar prohibition. 5 M.R.S. § 4633(1).

16

temporal relationship between the protected activity and the alleged adverse conduct will satisfy the causation element of the prima facie burden. *Mariani–Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir.2007) ("We conclude that the 'temporal proximity' between appellant's allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation."). That is, "[w]here the evidence shows only that the decision-maker knew of the complainant's protected conduct at the time the adverse employment action was taken, causation may be inferred from a very close temporal relationship between the protected activity and the adverse action." *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 – 74; *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004)). Plaintiff has thus established a prima facie case for retaliation.

As explained above, Defendant has presented record evidence to support the conclusion that Defendant terminated Plaintiff's employment for legitimate, nondiscriminatory reasons, and Plaintiff has presented evidence to support a determination that Defendant terminated his employment for other than the stated reasons. The issue is whether the evidence could support a finding that the other reason was at least in part the fact that Plaintiff filed a discrimination complaint.

Based on Plaintiff's report of the June 12 meeting between Plaintiff and Ms. Wilson, when the meeting concluded, Plaintiff's continued employment with Defendant was dependent upon the discussion at the June 14 meeting. Nevertheless, Ms. Wilson appeared at the meeting with a separation agreement for Plaintiff, and did not afford Plaintiff the option to continue in his employment. The only intervening event was the filing of Plaintiff's discrimination complaint. Given the very close proximity between the filing of the complaint and the termination of

Plaintiff's employment, given that Ms. Wilson was aware of the filing at some point before she met with Plaintiff to discuss his employment, and given that, contrary to Plaintiff's understanding at the conclusion of the June 12 meeting, Plaintiff's continued employment was not a possible option when he met with Ms. Wilson on June 14, for summary judgment purposes, Plaintiff has presented sufficient evidence to support his contention that the stated reasons are pretext for Defendant's unlawful retaliation.  Whether Defendant terminated Plaintiff's employment for lawful reasons or as the result of Plaintiff's filing of an administrative discrimination complaint is thus an issue for the fact finder.[17]

### CONCLUSION

Based on the foregoing analysis, the Court grants Defendant's motion for summary judgment on Count II of Plaintiff's complaint (disability discrimination), and denies Defendant's motion for summary judgment on Counts I (age discrimination) and III (retaliation).[18]

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 25th day of November, 2015.

---

[17] Defendant maintains that the evidence establishes that Plaintiff manipulated the process by filing his charge of discrimination immediately before a meeting at which he knew he might be terminated.  (Motion at 17 n.5.)  Defendant also argues that because Ms. Wilson prepared the separation agreement before the June 14 meeting, and before she received any notice of Plaintiff's charge of discrimination, the record cannot support Plaintiff's claim.  (*Id.* at 17.)  The facts upon which Defendant relies to support its arguments are disputed and, therefore, are properly left for the fact finder to evaluate.

[18] Through its motion, Defendant also sought to limit the damages that Plaintiff could recover for lost wages.  The scope of damages that Plaintiff could potentially recover is an issue that will be decided at trial.